Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**MICHAEL WATSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

MICHAEL WATSON,                        )
                                       )
    Appellant-Defendant,          )
                                       )
        vs.                  )     No. 49A02-1206-CR-443
                                       )
STATE OF INDIANA,                      )
                                       )
    Appellee-Plaintiff.           )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol J. Orbison, Judge
Cause No. 49G22-1106-MR-040329

**December 28, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Michael Watson stabbed a man in the heart, was charged with murder and being a habitual offender, and was sentenced to ninety years. Watson now appeals his conviction and sentence. He argues that the trial court erred in instructing the jury that it was not to disregard the law for any reason because this language unduly limited the jury's right to determine the law under Article 1, Section 19 of the Indiana Constitution. He also argues that his sentence is inappropriate in light of the nature of the offense and his character because it is effectively a life sentence for a crime of passion. We conclude that the trial court did not abuse its discretion in instructing the jury and that Watson has failed to persuade us that his sentence is inappropriate. We therefore affirm.

**Facts and Procedural History**

The facts most favorable to the verdict reveal that on June 3, 2011, Diontae Murphy and her two young children lived with Watson on the east side of Indianapolis. Diontae and Watson had recently ended their relationship but still lived together. Although Watson was interested in continuing their relationship, Diontae was interested in another guy, Willie McDowell.

On the morning of June 3, Diontae took her children to daycare and returned home, at which point she and Watson argued. Diontae then left and walked down the street, where Willie picked her up. Diontae and Willie spent a few hours together, picked up Diontae's children from daycare, and then Willie dropped them off near their house so that they could walk the rest of the way home. During this time, Watson called and texted Diontae. Watson's daughter also called Diontae to tell her that Watson had

2

changed the locks so that they could not get in the house. Diontae tried to use her key, and it did not work as suspected. Diontae then went to Watson's mother's nearby house. In the meantime, Watson called Diontae and told her that she and the children could come back home after all. Diontae and the children returned home. Diontae bathed her children and packed some clothes so that they could spend the weekend at her mother's house. Diontae then called Willie and asked him to pick them up two streets over.

As Diontae and the children were walking to meet Willie, Willie called her and told her that Watson was approaching them on his bicycle. Diontae then saw Watson, who asked her why Willie was picking them up. Diontae told Watson that their relationship was over, Willie was taking them to her mother's house for the weekend, and to go back home. Willie called Diontae back and told Diontae and the children to meet him at the Marathon gas station at 2964 South Keystone Avenue. Watson followed Diontae and the children on the ten-minute walk to the gas station and called three people along the way, asking them to meet him at the gas station because Diontae was "bringing this nig*** up here." Tr. p. 19.

When Diontae and the children arrived at the gas station, they immediately ran to Willie's car, which was backed into a parking space in front of the double doors to the gas station. Diontae put her children in the backseat, and as she was about to enter the front passenger seat, Watson pushed her out of the way and entered the car instead. While the two men were inside the car, Watson's body covered Willie's body from Diontae's line of vision, but Diontae was able to see that there was a "bunch of movement." *Id.* at 26. Willie, with Diontae's help, managed to push Watson out of the

3

car. Willie then got out of the car and said, "Aw, this nig*** stabbed me." *Id.* at 27. Diontae looked at Watson and saw that he had a six-to-eight-inch-long pocket knife in his hand, which he was in the process of closing. As Willie stumbled to the entrance of the gas station, Watson ran toward him and punched him, causing him to fall. Watson hit him a couple more times and announced, "Ain't nobody going to play me." *Id.* at 30. Diontae saw that Willie's white t-shirt was soaked in blood and called 911. Watson fled the scene.

Several gas station customers also witnessed the altercation. *Id.* at 49-58, 66-86, 92-99, 143-59. One customer, Drake Milam, saw the fight and later identified Watson as the attacker. Milam saw a knife inside the car. Milam also saw Watson throw punches at the driver and then saw the driver exit the vehicle, bleeding from his chest. Milam saw the driver walk toward the gas station and Watson following the driver. Watson then punched the driver, who fell to the ground. Milam saw Watson stab the driver with a knife as the driver was on the ground by the ice machine.

The gas station's security camera recorded the incident, but portions of the incident cannot be seen, either because they happened inside Willie's car or were blocked by the ice machine outside the gas station. State's Ex. 7.

As it turned out, Watson stabbed Willie in the heart, and Willie died from the seven-centimeter-deep wound to his chest that punctured his heart. Willie had some other superficial cuts as well as abrasions and bruises. The pathologist, Dr. Jolene Kelly, M.D., opined that after being stabbed in the heart, a person can still be conscious for a couple of minutes, run a short distance, and possibly engage in a fight.

4

The State charged Watson with murder. The State later alleged that Watson was a habitual offender.

Before the presentation of evidence during the guilt phase of Watson's jury trial, Watson objected to the trial court's Preliminary Instruction No. 3, which was based on Article 1, Section 19 of the Indiana Constitution. Watson believed that the second sentence of the instruction, italicized below, invaded the province of the jury and should not be given because the language is not contained in Indiana Pattern Jury Instruction No. 1.03:

> Under the Constitution of Indiana, the jury is given the right to decide both the law and the facts. *In fulfilling this duty, you are to apply the law as you actually find it, and you are not to disregard it for any reason.*
> The instructions of the court are your best source in determining what the law is.

Appellant's App. p. 105 (emphasis added) (capitalization omitted). When the trial court asked Watson if he had an alternate instruction, Watson responded that he would tender the same instruction, just without the second sentence. The trial court gave the instruction with the second sentence.

The jury found Watson guilty of murder and also found him to be a habitual offender. The trial court found two aggravators—Watson's extensive criminal history and the circumstances of the crime—and no mitigators and sentenced him to sixty years for murder, enhanced by thirty years for being a habitual offender.

Watson now appeals.

**Discussion and Decision**

Watson makes two arguments on appeal. First, he contends that the trial court erred in giving Preliminary Instruction No. 3. Second, he contends that his ninety-year sentence is inappropriate in light of the nature of the offense and his character because it is "effectively a life sentence" for a "crime of passion." Appellant's Br. p. 6.

## I. Article 1, Section 19 Instruction

Watson contends that the trial court erred in instructing the jury that it was not to disregard the law for any reason because this language unduly limited the jury's right to determine the law under Article 1, Section 19 of the Indiana Constitution. He argues that the trial court's "variance from the pattern instruction," which does not include this language, "renders the instruction . . . violative of the Indiana Constitution." *Id.* at 8.

The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010). In reviewing a trial court's decision to give a tendered jury instruction, we consider (1) whether the instruction correctly states the law, (2) is supported by the evidence in the record, and (3) is not covered in substance by other instructions. *Id.* The trial court has discretion in instructing the jury, and we will reverse only when the instructions amount to an abuse of discretion. *Id.* To constitute an abuse of discretion, the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Id.* We will consider jury instructions as a whole and in reference to each other, not in isolation. *Id.* A defendant is only entitled to reversal if he affirmatively demonstrates that the instructional error prejudiced his

substantial rights. *Hero v. State*, 765 N.E.2d 599, 602 (Ind. Ct. App. 2002), *trans. denied*.

Article 1, Section 19 of the Indiana Constitution provides, "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." Our Supreme Court has clarified that notwithstanding Article 1, Section 19, "a jury has no more right to ignore the law than it has to ignore the facts in a case." *Holden v. State*, 788 N.E.2d 1253, 1255 (Ind. 2003) (quotation omitted), *reh'g granted on other grounds*, 799 N.E.2d 538 (Ind. 2003). It is therefore improper for a trial court to instruct a jury that it has a right to disregard the law. *Id.*; *see also Walden v. State*, 895 N.E.2d 1182, 1184 (Ind. 2008) ("In *Holden*, we made clear that Indiana juries do not have a broad, general nullification power in criminal cases.").

Here, the trial court did not improperly instruct the jury that it had the right to disregard the law. Rather, Preliminary Instruction No. 3 said just the opposite:

> Under the Constitution of Indiana, the jury is given the right to decide both the law and the facts. *In fulfilling this duty, you are to apply the law as you actually find it, and you are not to disregard it for any reason.*
> The instructions of the court are your best source in determining what the law is.

Appellant's App. p. 105 (emphasis added) (capitalization omitted). Watson takes issue with the trial court's inclusion of the italicized language not because it is an incorrect statement of the law, *see* Appellant's Br. p. 12 ("it may be a correct statement of the law that a jury may not disregard the law . . . ."), but rather because the language is not included in Indiana Pattern Jury Instruction No. 1.03:

> Under the Constitution of Indiana you have the right to determine both the law and the facts. The Court's/my instructions are your best source in determining the law.

Indiana Pattern Jury Instruction No. 1.03—Criminal (3d ed. 12/2003).

The instruction that the trial court used here is actually the pattern jury instruction that is to be used during the second stage of a bifurcated trial, which in this case would have been the habitual-offender portion of Watson's trial. *See* Indiana Pattern Jury Instruction No. 15.11—Criminal (3d ed. 03/2010).[1] We agree that it is a better practice to use pattern jury instructions during the circumstances suggested by the pattern instructions themselves. But because the challenged language is not an incorrect statement of the law, the giving of the instruction was not error.

Watson also relies heavily on *Sample v. State*, 932 N.E.2d 1230 (Ind. 2010), to support his argument that his murder conviction should be reversed. *Sample*, however, involves the reversal of the defendant's habitual-offender adjudication, not his underlying convictions.

In *Sample*, the trial court gave a "law and facts" final instruction during the habitual-offender phase of trial that was similar to Preliminary Instruction No. 3 given in the guilt phase of Watson's trial:

> Under the constitution of Indiana, you are given the right to decide both the law and the facts of the case. In fulfilling this duty, you are to apply the

---

[1] Watson argues that Pattern Jury Instruction No. 15.11 should only be used for life-without-parole (LWOP) and death-penalty cases, but the Indiana Pattern Jury Instructions explain that Chapter 15 "provides suggested forms to deal with the necessity of separating a criminal trial into two or more distinct phases with verdicts after each phase. Bifurcation may be required by statute (death penalty, *habitual offender*) or by case law." Indiana Pattern Jury Instructions—Criminal 15-5 (3d ed. 12/2003) (emphasis added). Accordingly, Pattern Jury Instruction No. 15.11 applies to the habitual-offender phase of trials as well as death-penalty and LWOP cases.

law as you actually find it to be and you are not to disregard it for any reason. The final instructions you are now receiving are your best source in determining what the law is.

*Id.* at 1233. But the real problem came when the trial court instructed the jury, over Sample's objection, that if it determined that the State had proved beyond a reasonable doubt the existence of at least two prior unrelated felony convictions, then it "must" find that Sample was a habitual offender. *Id.* at 1231. The jury found that Sample was a habitual offender, and the trial court sentenced him to ninety-five years.

On appeal, Sample argued that the trial court erred by instructing the jury that if it found that the State had proved the predicate felonies, then it "must" find him to be a habitual offender. Based on Article 1, Section 19 of the Indiana Constitution, the Indiana Supreme Court held that such an instruction prevents the jury from making an independent and separate decision on habitual-offender status. *Id.* at 1232. That is, the jury has the independent and separate authority to determine whether a defendant is a habitual offender, even if the State has proven beyond a reasonable doubt that the defendant has accumulated two prior unrelated felony convictions. *Id.* Accordingly, our Supreme Court concluded that the trial court erred in instructing the jury that it "must" find Sample to be a habitual offender if it found that he had two prior unrelated felony convictions. *Id.*

The Court noted, though, that the error was not reversible if it was accompanied by another instruction informing the jury that it was the judge of the law and the facts. *Id.* at 1232-33. But the Court found that the erroneous habitual-offender instruction coupled with the law-and-facts instruction was a "deadly combination":

9

On the one hand the instruction advises the jury that it has the right to determine the law as well as the facts. But on the other, it tells the jury that the final instructions are the best source in determining what the law is. The final instructions included advising the jury that it "must" find the defendant to be a habitual offender if the State proves the predicate felonies. Ordinarily, the trial court's instructions are indeed the best source of the law. But not in this case because the trial court's instruction is wrong when it says the jury "must" find the defendant a habitual offender. Hence, the "best source of the law" instruction which can be curative in many cases is not here and instead exacerbates the problem. In this case the language of this "law and facts" instruction essentially renders meaningless the jury's Article I, Section 19 authority. "A defendant is entitled to have a *proper* Section 19 instruction presented to the jury in both preliminary and final instructions." *Bridges v. State*, 835 N.E.2d 482, 483 (Ind. 2005) (emphasis added). This instruction is improper.

*Id.* at 1233 (footnote omitted).[2]

In this case, as even Watson points out, *see* Appellant's Br. p. 10, there is no erroneous instruction coupled with Preliminary Instruction No. 3, which was what created the deadly combination in *Sample*. In other words, there is no allegation that the jury was improperly instructed in any other way. We therefore conclude that the trial

---

[2] Our Supreme Court provided the following instructions as examples of Article 1, Section 19 instructions:

[T]he Court now so instructs you, in this a criminal case, you are the judges of both the law and the facts. If, however, you shall have no well defined opinions as to what the law is relating to any particular matter or matters in issue in this case, then, in determining the law, you should give the instructions of the Court respectful consideration. . . .

You are the exclusive and sole judges of what facts have been proven and you may also determine the law for yourselves. This statement does not mean that you have the right to disregard the law or to set it aside and make your own law. You should determine the law as it is enacted by the legislature of this state and considered and interpreted by the higher courts of record, and in that way you have the right to determine the law for yourselves, but not to make your own laws.

*Sample*, 932 N.E.2d at 1233 n.3 (citing *Parker v. State*, 698 N.E.2d 737, 742-43 n.11 (Ind. 1998)).

court did not abuse its discretion in instructing the jury that it was not to disregard the law for any reason during the guilt phase of Watson's trial.[3]

## II. Inappropriate Sentence

Watson argues that his ninety-year sentence is inappropriate in light of the nature of the offense and his character and asks us to revise his sentence to one where "he [can] die outside of prison walls." Appellant's Br. p. 13.

Our rules authorize revision of a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "[A] defendant must persuade the appellate court that his or her sentence has met this inappropriateness standard of review." *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case. *Id.* at 1224.

---

[3] Watson claims that this case is similar to *Ludy v. State*, 784 N.E.2d 459 (Ind. 2003). In *Ludy*, our Supreme Court held that a jury instruction that stated that a conviction may be based solely on the uncorroborated testimony of the alleged victim if such testimony establishes each element of any crime charged beyond a reasonable doubt was erroneous because it: (1) unfairly focused the jury's attention on and highlighted a single witness's testimony, (2) presented a concept used in appellate review that is irrelevant to a jury's function as fact-finder, and (3) by using the technical term "uncorroborated," misled or confused the jury. *Id.* at 461. These same considerations are not present in this case, and therefore we do not find that *Ludy* controls this case.

11

A person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3. The court "shall" sentence a person found to be a habitual offender to an additional fixed term that is "not less than" the advisory sentence for the underlying offense, which in this case is fifty-five years, nor more than three times the advisory sentence for the underlying offense. Ind. Code § 35-50-2-8(h). The sentence, however, may not exceed thirty years. *Id.* The trial court sentenced Watson to sixty years for murder and enhanced that by the mandatory thirty-years for being a habitual offender.

As for the nature of the offense, Watson concedes that the murder was "brutal" but points out that he was in a "jealous rage." Appellant's Br. p. 15. The fact that the murder was, in Watson's own words, "an utterly senseless crime" does not lessen its seriousness. The facts show that Watson pursued Diontae and her young children as they walked to the gas station to meet Willie despite Diontae telling Watson that their relationship was over and to go home. Watson called his friends along the way for backup, and when they reached the gas station Watson pulled Diontae out of Willie's car while the children were already in the back seat, entered the car, and attacked and stabbed Willie in the presence of the children. Willie was stabbed in the heart and had defensive cuts on his hands.

As for Watson's character, it completes this tragic story. The trial court dubbed the thirty-nine-year-old Watson a "frequent flyer" in the criminal-justice system. Tr. p. 332. In addition to the two felony robbery convictions used to find Watson to be a habitual offender, Watson has juvenile adjudications for two burglaries, theft, and battery resulting in serious bodily injury as well as criminal convictions for Class A

misdemeanor resisting law enforcement, Class A misdemeanor carrying a handgun without a license, Class D felony criminal recklessness, and Class A misdemeanor driving while suspended. Watson has other arrests as well. Although Watson claims to be remorseful, to be his mother's "backbone," and to have "plans" for his education, Appellant's Br. p. 16, we do not find these claims to be particularly redeeming in light of his criminal history and the facts of this case. Watson has failed to persuade us that his ninety-year sentence is inappropriate.

Affirmed.

BAILEY, J., and BROWN, J., concur.